J-S34017-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: L.C.W., FATHER | : | |
| | : | No. 570 WDA 2022 |

Appeal from the Order Entered April 19, 2022
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s): CP-02-AP-0000228-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: M.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: L.C.W., FATHER | : | |
| | : | No. 571 WDA 2022 |

Appeal from the Order Entered April 19, 2022
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s): CP-02-AP-0000230-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: K.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: L.C.W., FATHER | : | |
| | : | No. 572 WDA 2022 |

Appeal from the Order Entered April 19, 2022
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s): CP-02-AP-0000229-2021

J-S34017-22

BEFORE:   DUBOW, J., MURRAY, J., and PELLEGRINI, J.*

MEMORANDUM BY MURRAY, J.:                    **FILED: OCTOBER 21, 2022**

L.C.W. (Father) appeals from the orders involuntarily terminating his parental rights to his three daughters:  K.W., K.L.W. (a/k/a K.W.), and M.W.[1] Upon review, we affirm.

K.W., K.L.W., and M.W. (Children) are the youngest of Father's eight children.  K.W. and K.L.W. are twins, born in October 2018; M.W. was born in May 2020.  The family has been involved with the Allegheny County Office of Children, Youth & Families (CYF) since 2001.  The orphans' court explained:

> Mother and Father have a lengthy history with CYF in Allegheny County.  Their oldest child was born on August 17, 2001, and CYF referrals date back to 2001, when he was a baby and removed from their care.  Beginning in 2008, the referrals to CYF became more "consistent," according to the caseworker.  In March 2018, CYF received a referral that the parents' oldest child was locked up inside the home and was not "let out to go to school, use the bathroom, shower or eat."  Their oldest child was removed from their home and a corresponding Childline [report], for unreasonably restraining or confining a child, was subsequently indicated.  CYF filed a petition for dependency on the oldest child and three other children [not K.W., K.L.W. or M.W.] that were residing in the home at the time.  The oldest child was adjudicated dependent and CYF withdrew the petitions on the three other children in July 2018.  Because the oldest child was dependent, CYF remained active with the family and provided various services, which included bus tickets to assist with transportation needs.  The caseworker testified that fifty tickets were requested

_____

* Retired Senior Judge assigned to the Superior Court.

[1] The orphans' court also terminated the parental rights of J.D.E., a/k/a J.W. (Mother), who has appealed at 584 WDA 2022, 586 WDA 2022, and 587 WDA 2022.  This Court consolidated Mother's appeals on June 15, 2022, and listed Mother's appeal for disposition by this panel on October 3, 2022.

- 2 -

and provided in October 2018, which corresponded to when K.W. and K.L.W. were born.

In late November 2019, CYF received a referral from Children's Hospital regarding the twins. Dr. Adelaide Eichman, a stipulated expert in child abuse and pediatrics, testified about her involvement with K.W. and K.L.W. at the time of their admission to Children's Hospital of Pittsburgh on November 26, 2019. Dr. Eichman testified that upon examination,

> the twins were 13 months old. The girls were quite small. They weighed about 11 pounds, which is roughly the size of a two-month-old. So the girls were very tiny in terms of height and weight. They had badly controlled eczema on their skin. And the girls were developmentally delayed. They were at the level of a nine-month-old, approximately, at that point.

The twins were also found to have Vitamin D deficient rickets, which per Dr. Eichman, is a bone condition caused by a lack of Vitamin D in their diet prior to the hospital admission. Dr. Eichman testified that she recommended hospitalization for two reasons. Dr. Eichman said that the twins were so malnourished that they exhibited signs of refeeding syndrome, due to electrolyte abnormalities, which required the refeeding to be done slowly and carefully. Dr. Eichman also recommended hospitalization to ensure that the twins did not have an underlying medical condition that was the cause of their low weight. Parents were not receptive to the twins being hospitalized, per Dr. Eichman.

Dr. Eichman testified her medical conclusion was that the twins did not have a medical condition that prevented them from gaining weight and that their low weight was a result of an inadequate diet. Mother told Dr. Eichman when the twins were initially hospitalized, that the twins were breastfeeding every two hours, that they were on a vegan diet but ate chicken fingers, and Mother was giving them some kind of supplement. Dr. Eichman testified that Mother stated "she kept herself alkalined" but Dr. Eichman was not familiar with what kind of diet that was.

Dr. Eichman stated that the twins did not have celiac disease. Additionally, the eczema that they had, while a common skin condition, was not well-controlled and as a result[,] the twins were scratching quite a bit until it cracked and bled. Dr. Eichman

also testified that the children each functioned with the developmental abilities of a nine-month-old, despite being thirteen months of age. The parents reported to Dr. Eichman that the twins "had many words;" however, Dr. Eichman had only heard them babble. Dr. Eichman testified that the twins were observably different, in that they were smaller and not as developmentally advanced for their age, and a reasonable caregiver would be able to recognize that they were not on track with growth or development. After their admission on November 26, 2019, the twins were discharged from the hospital on December 5, 2019, to the care of their parents. The parents met with the nutritionist and the general pediatrics team during the twins' hospitalization, and they were provided with verbal and written instructions regarding their care and feeding, per Dr. Eichman. Additionally, multiple weight checks were scheduled for the twins post-discharge, which included bringing them into the office and a home nurse coming to the family home. Dr. Eichman testified that during their hospitalization, the twins were gaining, on average, twenty grams per day, which was viewed favorably in the light of the feeding schedule put in place to avoid refeeding syndrome.

Despite the instruction and education provided to the parents, the scheduled appointments for weight checks in the home and the doctor's office, and the evidence that the twins were capable of gaining weight as demonstrated during their hospitalization, the twins were readmitted to Children's Hospital in January 2020. Dr. Eichmann testified that the readmission was due to the fact that they were not showing the weight gain that would have been expected while in Parents' care and because the parents had missed several of the twins' doctors appointments. Moreover, the eczema that had been treated with topical steroids had not improved while in Parents' care.

CYF obtained an Emergency Custody Authorization to remove the twins in January 2020 and the caseworker testified that at the time of the removal the twins appeared very small. Mother had told CYF that she had the twins "on a vegan diet and that she was also breastfeeding but also feeding them smoothies with fruit, hemp seeds, walnut milk." The caseworker testified that despite being hospitalized twice in a two-month time frame due to nutritional deficiencies[,] and discussions with the parents about the severity of the twins' presentation in November 2019[,]

- 4 -

Mother and Father did not seem to understand how serious the situation was.

After the twins' removal in January 2020, CYF put in Homebuilders, a thirty-day intensive in-home services program, to support the family. Homebuilders' goal, per CYF, was to work with the parents with scheduling and keeping appointments and addressing the children's needs. The parents did not appear to gain any additional insight from these services and Homebuilders suggested that Parents receive a neuropsychological evaluation, as well as in-home mental health services. The caseworker testified that the twins were placed into [a] foster home at that time and eventually moved into a relative['s] foster home in April 2020.

Mother had her eighth child, M.W., on May 16, 2020, and CYF obtained an Emergency Custody Authorization that same day. At the hospital discharge, the newborn[, M.W.,] was placed into the same relative['s] foster home as the twins. The twins were adjudicated dependent on May 20, 2020. CYF filed a petition for dependency on [M.W.,] the newborn, based on the significant concerns the agency had with respect to the parents' ability to appropriately feed and follow through with medical appointments. M.W., the newborn, was adjudicated dependent on June 25, 2020. Between the November 2019 hospitalization and the January 2020 hospitalization, twelve Childline [reports] were filed and indicated against Mother and Father for causing serious medical neglect, failure to provide proper nutrition and hydration, and failure to provide proper medical care.

[The orphans' c]ourt need not recite the extensive findings within the permanency review orders with respect to Mother and Father, as they are evident within []CYF Exhibit 5 - Certified Court orders. Without question, at the time the termination petitions were filed by CYF on November 4, 2021, and at the time of the termination proceedings on April 8, 2022, Mother and Father had made minimal progress towards remedying the issues and were in minimal compliance with the family service plan goals, despite CYF offering and providing services and evaluations aimed at efforts to reunify. *See* CYF Exhibit 5 - Certified Court Orders.

At the time of the termination hearing, the twins (K.W. and K.L.W.) were three and a half years old and had been in care twenty-seven consecutive months. M.W. was almost two years

old and had been in care her entire life, twenty-three consecutive months. Not subject to the instant matter, Mother and Father's oldest child resided outside of the home, and the three older sisters resided in the care of Parents, all four of whom are dependent.

Orphans' Court Opinion, 6/27/22, at 2-8 (record citations and footnotes omitted).

The orphans' court conducted the termination hearing on April 8, 2022. The Children were represented by legal counsel "appointed by court order, after [the orphans'] court conducted a conflict analysis." *Id.* at 2. CYF presented testimony from Dr. Eichman; CYF caseworker, Ashley Hobbs; licensed psychologist, Dr. Terry O'Hara; and licensed psychologist Dr. Beth Bliss. Father, Mother, and the Children's maternal grandmother testified in opposition to termination. By orders dated April 8, 2022, and entered April 19, 2022, the orphans' court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2),(5),(8) and (b). Father timely appealed.[2] Both Father and the orphans' court have complied with Pa.R.A.P. 1925.

Father presents the following questions for review:

1. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition[s] to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2)?

2. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition[s] to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(5) and (8)?

---

[2] Father filed separate notices of appeal for each child. This Court consolidated the appeals *sua sponte*. Order, 5/31/22.

3. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Father's parental rights would best serve the needs and welfare of the children pursuant to 23 Pa.C.S. § 2511(b)?

Father's Brief at 10-11.

In considering Father's issues,

our standard of review requires [us to] accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

As [the Supreme Court] discussed in **In re: R.J.T.**, [9 A.3d 1179, 1190 (Pa. 2010)], there are clear reasons for applying an abuse of discretion standard of review in these cases. [U]nlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. **R.J.T.**, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead, we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

**In re Adoption of S.P.**, 47 A.3d 817, 826-27 (Pa. 2012) (some citations omitted).

CYF has the burden to prove by clear and convincing evidence that its asserted grounds for termination were valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). "[T]he standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* Under 23 Pa.C.S.A. § 2511, "the court must engage in a bifurcated process prior to terminating parental rights." *In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007). Initially, the focus is on the conduct of the parent pursuant to § 2511(a). *Id.*

<u>Section 2511(a)</u>

With respect to grounds for termination under Section 2511(a), we need only agree "as to any one subsection in order to affirm the termination of parental rights." *In re A.S.*, 11 A.3d 473, 478 (Pa. Super. 2010). Instantly, we address the second subsection, which provides for termination when

> repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

Subsection 2511(a)(2) "emphasizes the child's present and future need for 'essential parental care, control or subsistence necessary for his physical or mental well-being.'" *In re E.A.P.*, 944 A.2d 79, 82 (Pa. Super. 2008)

- 8 -

(citation omitted). Grounds for termination under subsection (a)(2) are not limited to affirmative misconduct. *Id.* "Where the parent does not exercise reasonable firmness in declining to yield to obstacles, h[is parental] rights may be forfeited." *Id.* at 83. Grounds for termination under § 2511(a)(2) may include acts of refusal as well as incapacity to perform parental duties. *In re S.C.*, 247 A.3d 1097, 1104 (Pa. Super. 2021). We have long recognized that a parent is required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities. *In re Adoption of M.A.B.*, 166 A.3d 434, 443 (Pa. Super. 2017).

Father argues the orphans' court erred in finding grounds for termination under Section 2511(a)(2) because there was insufficient proof "that repeated and continued incapacity, abuse, neglect or refusal exists." Father's Brief at 21. Father claims he "met his goals that were established by both the agency and the [c]ourt []." *Id.* at 15. He references his goals of attending Children's medical appointments, visiting with Children, and "understand[ing] actually what had happened to the children." *Id.* at 23 (citing N.T., 4/8/22, at 38). Father states, "CYF presented no evidence that indicated that the parents did not attend the medical appointments" or "did not attend visits." *Id.* at 24. He concludes: "Thus, Father completed this goal." *Id.* Father also references his testimony with respect to his "understanding the Children's medical issues," and "some deficiencies by the parents that were remedied." *Id.* at 25. Again, he claims he "completed this

goal." *Id.* He adds "this family has had stable and appropriate housing for eight years." *Id.* (citing N.T., 4/8/22, at 170). He emphasizes that he and Mother have "raised multiple children together," and have a "stable and healthy romantic relationship." *Id.* at 25 (citing N.T., 4/8/22, at 128). He also emphasizes that he and Mother have no criminal history, "substance abuse issues or mental health problems"[3] and "are both medically healthy." *Id.* at 26 (citing N.T., 4/8/22, at 128-129). Finally, Father refers to evidence demonstrating he can "properly parent" Children, including his "involvement with Arsenal for parenting assistance" and working "with a developmental therapist to learn the best parenting[.]" *Id.* at 26 (citing N.T., 4/8/22, at 175). Father concludes that he met his parenting goals, and "[t]hat, along with Father's understanding of the feeding issue, show that termination should not be granted." *Id.* at 27.

To the contrary, CYF argues:

The parents do not have the judgment or insight to progress to an understanding and acknowledgement of [C]hildren's medical condition and an acceptance of the responsibility for it. The parents did not progress to more frequent periods of unsupervised

---

[3] With respect to mental health, CYF caseworker Ashley Hobbs testified "the family started working with Mercy Behavioral Health in March of 2020," and continued "for about a year." N.T., 4/8/22, at 50. She also stated that in August 2021, "a service was identified called ABS, which is Adaptive Behavioral Services. It's a culturally competent service that could provide telehealth appointments for mental health therapy focused around trauma-related incidents. And this was offered to [Father and Mother]." *Id.* Ms. Hobbs testified that neither parent participated with ABS, and never acknowledged "to any service provider or the agency that they have problems and need treatment." *Id.*

visitation but had visitation decreased due to their actions. They barely cooperated with the services offered to them and denied any problems.

Participant Brief at 21.

Children's counsel agrees with CYF, stating that the record "is replete with competent, clear and convincing evidence to sustain" termination. Appellee Brief at 14. Counsel further states:

> While Father has made progress on his court ordered goals, the primary reason [C]hildren came into care continue[s] to exist. The evidence in the record supports the [orphans'] [c]ourt's findings that Father will not be able to rectify the issues that [caused C]hildren to remain in care within a reasonable time.

*Id.*

As indicated by CYF and Children's counsel, the record belies Father's argument. The orphans' court addressed both parents' shortcomings:

> With respect to 23 Pa. C.S. § 2511(a)(2), the orphans' c]ourt found that CYF clearly and convincingly proved the requisite grounds. Goals were set forth for Mother and Father in order to remedy the incapacity, abuse, neglect or refusal that caused [C]hildren to be without proper parental care necessary for their physical and mental well-being. These goals included parenting, visitation, cooperation with service providers and the agency, and of significant import[], some demonstrated accountability and understanding of what happened that lead to the twins' severe malnutrition and developmental delays.
>
> Mother and Father's efforts on addressing the goals throughout this case could be best described as stagnant. At each and every permanency review hearing, the [orphans' c]ourt found that Mother and Father made "minimal progress" towards alleviating the circumstances which necessitated the original placement. Parents both appeared to be perpetually stuck and would regularly revisit the reasons why [C]hildren were removed and adjudicated dependent despite the orphans' c]ourt, at each

- 11 -

hearing, encouraging the parents to address the goals and ordering services to assist their efforts towards reunification.

Orphans' Court Opinion, 6/27/22, at 12-13.

The record supports the orphans' court's determination that Father evidenced an incapacity to properly parent Children. For example, Ms. Hobbs testified that both parents were referred for mental health evaluations as recently as January 2022, but never acknowledged "to any service provider or the agency that they have problems and need treatment." N.T., 4/8/22, at 50. Ms. Hobbs opined:

> [O]ver the course of over two years, neither of the parents have taken any form of responsibility for any missed, no-showed, rescheduled doctors' appointments that essentially led their children to come into care. Over the two years that I have worked with them, there really has been minimal progress with respect to that.
>
> And with respect to even acknowledging [] other services, if a service does not occur, it's the [provider's] fault. It's not the parents' fault. They do not know how to take responsibility for even minor things that a person can take responsibility for. And that would … cause these children to be potentially in harm's way moving forward as they get older. There's a concern that their educational needs are not going to be met. There's a concern that their medical needs will not be met. And any of their other basic needs may not be met due to the [parents'] lack of responsibility and acknowledgement across the board, not just specifically the reasons that the kids came into care.

*Id.* at 64-65.

The parties stipulated to Dr. O'Hara's expertise in child and forensic psychology. Dr. O'Hara performed individual and interactional evaluations of Father in July 2020. *Id.* at 98. At that time, Dr. O'Hara concluded Father's

"insight and judgment" was poor, "based on a variety of factors, including lack of cooperation with services but, moreover, his lack of insight with respect to the findings from" the Children's Advocacy Center at Children's Hospital of Pittsburgh. *Id.* at 106. Dr. O'Hara testified:

> I'm really limited in what I can say about the parties now. I haven't seen them in approximately two years. But at the time of the evaluations, it was my perspective that mental health treatment and the services that I outlined in my reports were strongly advisable for both [Father and Mother].

*Id.* at 107.

Father was evaluated two years later, in 2022, by Dr. Bliss. The parties also stipulated to Dr. Bliss being an expert in child and forensic psychology. *Id.* at 117. Dr. Bliss performed individual evaluations of Father and Mother; she first saw Father on February 11, 2022. *Id.* at 119. Dr. Bliss testified that initially, neither parent "showed up" for their appointments. *Id.* at 118. Dr. Bliss performed an interactional evaluation with Father and the Children. *Id.* Dr. Bliss testified:

> In the testing that [Father] had completed, it was shown, he had basically denied having pretty much any problems at all in any of the areas at all to a degree that's much lower than typical or normal and is usually indicative of defensiveness and guardedness. In the interview, he didn't really report any problems at all, which could certainly be true, but also could have been due to defensiveness.
>
> And one observation that I made was, it was unusual how often he remembered very specific dates to events, to the point where either he has an excellent memory, excellent recall of dates, pretty much every single date he listed out. That is sometimes something that can be seen with people as a form of deception. They present -- they try to provide as much

information as possible to make it look more accurate than it actually is.

***Id.*** at 121-22. Dr. Bliss opined that Father's "judgment and insight in parenting [was] low." ***Id.*** at 122.

The above evidence supports the orphans' court's conclusion that Father "had a goal to cooperate with service providers and CYF and … failed to make any modicum of progress … throughout the life of the case." Orphans' Court Opinion, 6/27/22, at 21. Accordingly, the court concluded that Father's repeated and continued incapacity to parent caused the Children to be without essential care, and the incapacity could or would not be remedied. 23 Pa.C.S.A. § 2511(a)(2). We discern no error in the orphans' court's termination of Father's parental rights under Section 2511(a)(2).

Section 2511(b)

Father also argues the trial court erred in terminating his parental rights under Section 2511(b), which requires the orphans' court to "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). Father asserts the court improperly disregarded evidence of the bond between him and the Children, and the "psychological detriment to the [C]hildren if their bond with their Father is severed." Father's Brief at 15-16.

CYF recognizes the Children "are bonded to [Father] and the foster parents." Participant Brief at 21. However, CYF argues that any detriment to the Children from termination "would be ameliorated by [Children's] loving,

close and stable relationship with the foster parents." ***Id.*** Similarly, Children's counsel argues that termination serves Children's needs and welfare, stating "[t]here is no evidence that the [C]hildren would suffer extreme emotional consequences should contact with Father cease." Appellee Brief at 14. Upon review, we agree that the evidence supports the orphans' court's decision regarding the Children's best interests.

"Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." ***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007). When the court considers a child's needs and welfare, the "extent of any [parental] bond analysis ... necessarily depends on the circumstances of the particular case." ***In re K.Z.S.***, 946 A.2d 753, 763 (Pa. 2008).

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

***In re A.S.***, 11 A.3d at 483 (citations omitted).

Father's argument regarding the "psychological detriment to the children" is not persuasive. We acknowledge Ms. Hobbs' testimony that Father's interactions with Children are appropriate, and Father engages in

- 15 -

developmentally appropriate play during visits. N.T., 4/8/22, at 66. Ms. Hobbs agreed that Father's "visits [with Children] go well." *Id.* at 67. She also testified that the Children were bonded with their other siblings. *Id.* at 68. Nonetheless, the orphans' court concluded:

> The court does believe Mother and Father when they express their love for these three children. However, the twins have been in care twenty-seven consecutive months and the younger child has been in care since birth. The [c]ourt accepts the very credible testimony of Dr. O'Hara and Dr. Bliss, and agrees that that termination meets the needs and welfare of these children and termination is in the Children's best interest. **These parents had two individual evaluations by separate evaluators roughly eighteen months apart and these evaluations demonstrated that neither Mother nor Father were any further along in gaining the necessary judgment and insight to parent these children**. Furthermore, Mother and Father failed to present any credible testimony or evidence to overcome the evidence that overwhelmingly supported this conclusion. **This [c]ourt found that any potential negative impact would be mitigated by the fact that the [Children] have been in relative placement this entire time and have exposure and contact with additional, extended family members, who also love and support them**. For these reasons, the [c]ourt did not commit an error of law or abuse of discretion in finding that termination best met the needs and welfare of these children.

Orphans' Court Opinion, 6/27/22, at 29-30 (emphasis added). The record supports the orphans' court's findings.

As discussed, Dr. Bliss conducted individual and interactional evaluations of Father, Mother, the Children and the foster parents. When asked whether the Children were "able to be reunified with [Father and Mother?]," Dr. Bliss answered, "no." N.T., 4/8/22, at 131. Children have lived with the foster parents, who are a pre-adoptive resource, since 2020. Dr.

Bliss testified that the Children are bonded with the foster parents, and observed their interaction to be positive and appropriate. *Id.* at 127-28.

Ms. Hobbs testified that the foster parents meet the Children's emotional and developmental needs. *Id.* at 63. She also stated:

> I have observed a clear and definite bond and attachment between the foster parents and the [C]hildren. … The girls seem very comfortable with the foster parents. They're very happy when they're around them. They smile, they go to them if they need something. They'll ask questions and say, auntie or uncle, can you get me this, can you do that. They often are sitting on their laps or playing with them during my visits. And they're very attentive to their needs when they need something.

*Id.* at 62-63. Ms. Hobbs added that the foster parents meet the Children's medical and educational needs, and opined that termination of Father's parental rights would serve the Children's needs and welfare. *Id.* at 64-65.

Consistent with the foregoing, we discern no error in the termination of Father's parental rights under 23 Pa.C.S.A. § 2511(b).

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/21/2022

- 17 -